UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>TINA LE, STEVEN NGUYEN, and )<br>  MERCEDES ACAR, )<br>)<br>                Defendants. )<br>_____) | CRIMINAL ACTION NO. 05-10277-PBS |

### MEMORANDUM AND ORDER

July 25, 2006

Saris, U.S.D.J.

Defendant Tina Le, charged with mail fraud and other crimes in connection with temporary employment agencies, moves to suppress statements on the ground that she was not given her Miranda rights. At the hearing, FBI Agent Michelle Bloch, IRS Special Agent Jessica Crocker, and FBI Agent Kristin Koch testified for the government. After hearing, I **DENY** the motion to suppress.

### FINDINGS OF FACT

On December 15, 2004, at 7:00 a.m., the police conducted a search of the three-floor residence of Defendant Tina Le at 301 Adams Street, Quincy, Massachusetts pursuant to a search warrant. Le was not home. A SWAT team entered first to do a protective sweep because the FBI had information that the home had been bullet-proofed and that cameras were present throughout the house. The members of the SWAT team had weapons and wore body

armor.  Le was not present when the raid occurred.  Defendant Acar, who is Le's daughter, and other occupants were present in the home and were instructed to sit in pajamas in the living room, where law enforcement personnel watched them.  After the SWAT team cleared the house, fifteen members of the FBI Evidence Response Team (ERT) entered the premises.  About forty persons were participating in the search, including the SWAT team, ERT, IRS agents, and Quincy police officers.  Some wore distinct uniforms with the FBI marking and some weapons were visible, but none drawn.

Acar called Le and told her to come home.  The FBI was waiting in surveillance vehicles nearby because they had a seizure warrant for Le's car.  Agent Koch saw Le drive past the home in her Mercedes Benz and followed her to the parking garage at Quincy City hospital one block away.  Agents were visible at the house as Le drove past.  Once at the parking lot, the FBI agents blocked her vehicle with their car, agents wearing FBI jackets got out of their vehicle, and an FBI Agent told Le he had a seizure warrant for her vehicle.  No guns were drawn.  Le was told she was not under arrest and was asked if she wanted a ride home.  It is unclear whether Le understood these statements as there was no Vietnamese interpreter at the scene.  Agent Koch recalls Le asking in English why Le could not take the car.  The exchange was civil.  Le was not crying, but she did seem

concerned. Quincy police officers "escorted" her back to the residence. The ride took a few seconds, and the SWAT team was gone when she arrived. Two uniformed police officers were stationed at the door. Le was never placed in handcuffs.

At 7:45 a.m., agents began an interview with Le at her dining room table. Present were two female officers Bloch and Crocker, male officer Scott Faragi with the Insurance Fraud Bureau, and an interpreter. None was in a uniform or had a gun visible. The agents sat across from Le while the interpreter sat next to her. The kitchen and the living room, where members of her family were being observed by the FBI, were in full view of the dining room. Le could see other members of the FBI response team, who were doing the search, but no weapons were drawn. Bloch told Le that she was free to leave at any time and that she was not under arrest. Le was told it was her choice whether to answer questions and was not given Miranda rights. Le read the search warrant with the assistance of the interpreter, who interpreted all of the agent's questions and Le's answers.

Le said she did not want to hide anything. After answering some questions, she said she wanted to talk to a lawyer, Stephen Greenbaum, before responding further. The interrogation stopped. However, when Bloch wanted to search Le's vaults in the basement and bedroom, the keys did not work. Bloch told Le that the FBI would have to get a locksmith unless Le opened the vaults. Le

went down and opened them.[1]  Le made no further statements. Altogether, the interview lasted forty-five minutes to an hour.

At some point during the interview, Defendant Acar, was allowed to leave the house, and other occupants left the house as well.  Also, another male was simultaneously being interviewed in another part of the house.  Le's lawyer, Greenbaum, arrived at 10:00 a.m., and Le left the house to meet him.

Ms. Le is a petite woman in her late forties who does not speak English well.

## CONCLUSIONS OF LAW

Defendant Le argues that the government violated her Fifth Amendment rights when it engaged in custodial interrogation without first giving her Miranda warnings.  The government responds that no Miranda warnings were necessary because the defendant was not in custody.

The police are required to give Miranda warnings where the "questioning [was] initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda v. Arizona, 384 U.S. 436, 444 (1966).  The "ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."

---

[1] The government is not seeking to introduce evidence of this conduct.

4

California v. Beheler, 463 U.S. 1121, 1125 (1983).  Courts must use objective standards to determine whether there was a "manifestation of a significant deprivation of or restraint on the suspect's freedom of movement."  United States v. Lanni, 951 F.2d 440, 442 (1st Cir. 1991).  In doing so, a court should consider "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation."  Id. (quoting United States v. Masse, 816 F.2d 805, 809 (1st Cir. 1987) (quotations omitted)).

Using these factors, I conclude that Defendant Le was not in custody while she was being interviewed because: (1) she was told she was not under arrest, was free to leave, and could decline to answer questions; (2) she was not in handcuffs; (3) her daughter, Defendant Acar, was allowed to leave the house; (4) no guns were drawn; (5) the questioning took place no longer than an hour in the familiar surroundings of her dining room; and (6) Le was never touched in any way by law enforcement officers.

Defendant Le emphasizes that she had a limited understanding of the American legal system because of her Vietnamese heritage, that there were forty agents in the house, and that she was "escorted" back to the house by two Quincy police officers.  While these considerations are relevant, they are not dispositive

here. It is true that "a suspect's sense of captivity can actually be intensified by the intrusive and intimidating environment created when agents of the law take control of a person's private residence," United States v. Griffin, 922 F.2d 1343, 1355 n.15 (8th Cir. 1990), but Ms. Le was expressly told through an interpreter not only that she was not under arrest, but also that it was her choice whether to stay and talk to police. A business woman with some economic resources, she had sufficient understanding to refuse to answer any questions and to wait for her lawyer. Regardless of Defendant Le's subjective belief of her status, the inquiry is an objective one. See Lanni, 951 F.2d at 442. When all circumstances are considered, no reasonably objective person would conclude she was in custody.

## ORDER

The motion to suppress is **DENIED**. (Docket No. 38.)

_____
PATTI B. SARIS
United States District Judge